1  STEVEN G. KALAR
2  Federal Public Defender
   JODI LINKER
3  Assistant Federal Public Defender
   450 Golden Gate Avenue
4  San Francisco, CA 94102
   Telephone:     415.436.7700
5  Facsimile:     415.436.7706
   Jodi_Linker@fd.org
6
7  Counsel for Defendant TRAORE

8
              IN THE UNITED STATES DISTRICT COURT
9
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                   SAN FRANCISCO DIVISION
11

12
   UNITED STATES OF AMERICA,              Case No. CR 20-029 VC
13
                   Plaintiff,             **DEFENDANT'S SENTENCING**
14                                        **MEMORANDUM**
15 v.
                                          Date:   May 2, 2020
16 MUSTAPHA TRAORE,                       Time:  10:00 a.m.
                                          Court: The Honorable Vince Chhabria
17                 Defendant.
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

I.   THE COURT MUST IMPOSE THE LOWEST SENTENCE NECESSARY TO ACHIEVE THE
     GOALS OF SENTENCING ................................................................................... 3

   A.   Mr. Traore's Unique and Tragic History and Characteristics and the Nature and Circumstances
        of the Offense of Providing False Information on a Passport Application to Escape the Horrors
        of His Life in Africa and Seek a Better Life in the United States.................................................4

   B.   Consideration of Prior Conviction for Accessory After the Fact.................................................6

   C.   Overstatement of Criminal History Category .........................................................................10

   D.   Treatment Will Be the Strongest Form of Deterrence and Will Best Assist Mr. Traore in
        Rehabilitation .................................................................................................................12

   E.   Need to Avoid Unwarranted Disparities in Sentencing .............................................................12

   F.   Consideration of the Mr. Traore's Possible Removal from the U.S. ...........................................13

   G.   Home Confinement and Three Years of Probation is Sufficient Punishment ...........................13

II.  A TIME-SERVED SENTENCE IS ALSO WARRANTED IN LIGHT OF THE COVID-19
     PANDEMIC........................................................................................................ 14

CONCLUSION................................................................................................................ 17

**INTRODUCTION**

To write that a defendant has suffered a challenging upbringing has almost become trite in the criminal justice system. What is clear is that so many of those who are now facing sentences for committing federal crimes disproportionately have been through tragedy, adversity and despair, and their criminal conduct is often a reflection of that. To learn about defendant Mustapha Traore's[1] background takes tragedy, adversity and torment to an entirely new level. His life, his story, his struggles, are beyond comprehension. He has survived physical, emotional, and sexual abuse; been put in the center of war as a child and attacked for not being on the "right" side of certain battles; witnessed the rape of his mother and lives with the scars of his visceral desire to protect her; he was basically homeless for much of his adolescence, and each place he briefly called home was a den of abuse and despair; he never had any real stability and structure to allow for a sense of security. It is no wonder that a person with this upbringing would want to flee the past and start anew, with a new name in a new country and a chance at a new and better life.

Now, however, Mr. Traore must face the consequences of his decision eighteen years ago to escape his old life and seek new opportunities. He has fully accepted responsibility for his crime: providing a false name in 2011 on a passport application in violation of 18 U.S.C. § 1542. He has also served a sufficient amount of time in jail to punish him for his conduct. Accordingly, pursuant to all of the factors under 18 U.S.C. § 3553(a), he respectfully requests that the court sentence him to a sentence of time-served with three years of supervised release, including six months of home confinement.

**BACKGROUND**

There has been a marked change in the amount of information now known about Mr. Traore's background since the beginning of this case. Given the nature of the charge against him, Mr. Traore has been forced to pull the lid off the tragic upbringing he worked so hard to keep hidden because of its devastation and pain. For the first time, he has told his wife and others about what he endured. That was no small task for someone who has managed for nearly two decades to keep it all bottled inside in the hope that it would be forgotten.

---

[1] For purposes of this memorandum, defense counsel will refer to the defendant by his name as charged, Mustapha Traore.

*US v. Traore,* Case No. 20-029 VC;
Def.'s Sentencing Memo.                                  1

Mr. Traore requests that the Court pause here and take the time to read the psychological evaluation from Dr. Scott Lines in detail. Declaration of Jodi Linker (hereinafter "Linker Decl.") at Ex. C, Psychological Evaluation of Dr. Scott Lines, PhD. That report was written after a three-hour video meeting with Mr. Traore. It acknowledges that it only scratches the surface given the time and video constraints, but it provides the Court with the most detailed social history possible. Indeed, it is provided to the Court less for the diagnosis (which is certainly relevant for treatment purposes) and more as the most efficient way to explain Mr. Traore's tragic and unique childhood. That background will not be repeated here.

Having read that report, the Court undoubtedly understands what might otherwise seem to be histrionic language. It is not. Indeed, it is hard to characterize in words all that Mr. Traore has been through, but one is left with a visceral response to such depravity. His attempt to escape that devastation is what brings us to the instant offense conduct.

To flee his past, including threats on his life from people who wrongly believed he was fighting against the Ivory Coast government, Mr. Traore sought to leave the Africa. He first went to the France. Once there, he was eventually he was able to secure a French passport in the name of Olivier Adella, which he used to come to the United States.[2]

He arrived in the U.S. in 2002. He originally lived in New York and did his best to find work. Life was difficult for him when he first arrived. He did not have any friends or family in the U.S. and struggled to find his way as a new immigrant in this country who did not understand the language or the culture and had no money. As a result, he made several mistakes and had several (relatively minor) brushes with the law. He later met Rasha Wrice and the two married in approximately 2005. He started working steady jobs and his life settled significantly after meeting Ms. Wrice. She was a travelling nurse so they moved several times, first to Scottsdale, Arizona and then to San Bruno, California. He earned a Sports Science certificate so that he could be a professional trainer and started his own training business. At the same time, he was a licensed limousine driver and started a sole-proprietorship, La Croiserie Limo. Around 2012, his marriage fell apart. The couple had no children, but it was a tense and difficult

---

[2] As Mr. Traore has explained, those coming from African countries need to get a visa to come to the United States, which is hard to come by. With a European passport, however, visitors came come to the United States without a visa, which is why many Africans seek European passports.

break-up as Ms. Wrice did not want Mr. Traore to leave.

They finally separated and he started a healthy and positive relationship relationship with Uta Bredenstein. They had a child, Aksel, in Feburary 2016, and married later that year. Ms. Bredenstein has two teenage children from a prior relationship that Mr. Traore is very involved in raising.

In a letter to the Court, Mr. Bredenstein expresses what a wonderful father, husband and stepfather he is and how vital he is to their safety and security, both financially and emotionally. Declaration of Jodi Linker, Ex. B, Letter from Uta Bredenstein to the Court. She explains the strong and loving bond he has with his son and how devastating his separation from them has been. *Id*. Additionally, Ms. Bredenstein shares deeply personal thoughts on how it has been over the last few weeks to learn so much about Mr. Traore's past, which he had never previously shared. She explains how much of his past informs who he is now, not just the nightmares, teeth grinding and anxiety, but the deep and extreme bond he has with his son and wife, and the depth of his desire to protect them. While most parents have an instinctive and intense desire to protect and be with their family, Mr. Traore's fatherhood is fully informed by the extreme lengths that his mother went through to try—yet fail—to shield Mr. Traore from the daily horrors that they faced. Talking to his wife and Dr. Lines, Mr. Traore has only begun to scratch the surface to process and heal from his past.

It is with this background in mind that the Court must determine what a reasonable and appropriate sentence is for providing false information on a passport application.

## ARGUMENT

### I.    THE COURT MUST IMPOSE THE LOWEST SENTENCE NECESSARY TO ACHIEVE THE GOALS OF SENTENCING

Mr. Traore's final adjusted offense level is 10 and criminal history category is technically V, resulting in a range of 21-27 months. Mr. Traore requests that the Court sentence him to time-served, 6 months of home confinement and three years of probation.

In sentencing Mr. Traore, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the sentencing guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

necessary" to achieve the goals of section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Section 3553(a) directs the court to consider a number of additional factors, including the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Mr. Traore requests that the Court consider the following in evaluating the § 3553(a) factors.

**A. Mr. Traore's Unique and Tragic History and Characteristics and the Nature and Circumstances of the Offense of Providing False Information on a Passport Application to Escape the Horrors of His Life in Africa and Seek a Better Life in the United States**

Mr. Traore's history and characteristics are inextricably intertwined with the nature and circumstances of the offense. He undoubtedly had reason to flee Africa. While his mother did everything she could to shield and protect her son, their abject poverty and the unyielding civil wars in the region made that impossible. She was raped and he was forced to watch. When he tried to intervene, as a very young boy, he was sexually assaulted, slayed in the face with a knife and left to die. Fortunately, he did not die, but the scar on his face and in his soul remain to this day. When they escaped one horror, they only stumbled into another, to the point that Mr. Traore found solace back in the home of Kaba Traore, who he calls his foster father, but whose home he had earlier left because of the abuse and suffering there. Not surprisingly given the life she was forced to live, his mother died of AIDS, leaving Mr. Traore basically alone to fend for himself. He did what many resourceful people with no options dream of doing: he found a way out. Using his prestige in martial arts, he leveraged a trip to France to fight in a martial arts tournament into a way to leave the dangers and threats in Africa. Once in France, he hustled and scrounged to get by until he was able to secure a French passport so he could come to America.

When he got here, he certainly made his share of mistakes. Not knowing the language and with

no money, he did things for which he is not proud. Linker Decl., Ex. A, Mr. Traore Letter to the Court. His integration into life in the United States was rocky the first few years. Eventually, however, he was able to find his way. He married, began stable employment and began a healthy and fulfilling life. After he divorced his first wife, he was fortunately able to start anew with a loving, caring and supportive partner. Ms. Bredenstein has two children from a prior marriage, who Mr. Traore actively and caringly parents. The couple's own child is the center of Mr. Traore's universe. That all fell apart because of a lopsided "friendship" with Ms. Li and Mr. Bayat, who convinced him to do something he never wanted to be involved in. For that, his whole life has been upended.

It was through that case that the investigation into his identity began. It did not begin because the real Olivier Adella complained or had been harmed in any way. Instead, investigators for Ms. Li began to investigate Mr. Traore because he was the principal witness against her. It was not hard to determine that he had used other names as Mr. Traore did not carefully hide that fact. As noted in the PSR and as shown to the Court at the detention hearing, Mr. Traore included several aliases and criminal convictions in his applications with the Immigration Service. On the Application for Naturalization, N-600, he listed Mustapha Traore and Moussa Mustapha as aliases, as well as the three arrests he remembered. When Ms. Li's investigators determined Mr. Traore's aliases, the information was provided to the District Attorney's office.[3] As such, while asserting that Olivier Adella was his true name was certainly a violation of the law, the nature of his offense is not so egregious relative to other federal criminal cases.[4]

Despite all he has been through, what Mr. Traore never did—with his wife, or attorneys in prior cases, or any therapist—was address his tragic past. Instead, he bottled it all up and hid much of his prior life in the hope that it would disappear. It did not disappear. Instead it has left him with extreme Post Traumatic Stress Disorder and other struggles that have yet to even be explored. If there is one upside of the instant case, it is that it has forced him to now contend with the horrors of his past.

As section 3553(a) dictates, his tragic past and the nature of the current offense are paramount

---

[3] The D.A.'s office had evidence at least as early as May 31, 2016 that Mr. Traore had lived under a different name and date of birth.

[4] Notably, the only intentionally false statement in this case was Mr. Traore's namesd as he does not actually know his date or place of birth.

*US v. Traore*, Case No. 20-029 VC;
Def.'s Sentencing Memo.                                5

considerations for the Court in determining a reasonable and appropriate sentence. Mr. Traore expresses remorse for his actions and explains—in his own words—the poor decisions he has made. Linker Decl., Ex. A, Letter to the Court. He states his clear desire to do better and recognizes that he needs help in doing so. He wants and needs therapy. Mr. Traore pleaded guilty at the earliest possible opportunity, and has continuously and forthrightly accepted responsibility for his actions.  Other than seeking his release from custody, Mr. Traore has filed no motions and did not delay his case in any way.

In light of his history and characteristics and the nature and circumstances of the offense, which are so deeply intertwined in this case, a time-served sentence is warranted.

### B.  Consideration of Prior Conviction for Accessory After the Fact

Mr. Traore was indeed embroiled in a horrible crime in 2016. It is clear that the District Attorney's office is not pleased that the result of the three-year investigation into that crime resulted in one conviction for the least culpable individual, but that does not define Mr. Traore's entire life, leave him to hold the bag for all involved, or warrant additional punishment now. He has pleaded guilty in state court to what he did, fully cooperated with the government, and served the entirety of his state sentence, with no opportunity for concurrent time as the state time is completed. Mr. Traore has been suffering greatly since he has been in custody. He passed out in court before Judge Kim on January 27, 2020, hit his head on the podium and had to spend five days in the hospital. As no physical cause of his ailments could be found, the most likely explanation is that he fainted due to the stress and anxiety of being separated from his family.

As there is nothing particularly egregious about Mr. Traore's offense conduct here, the thrust of the government (and Probation)'s argument for why Mr. Traore should receive such a lengthy sentence is entirely based on his recent prior conviction for accessory after the fact. Such inflated—and often inaccurate—statements by the government about that prior case, however, do not warrant a sentence above time-served here.

Of course, this Court cannot re-litigate all of the issues in that case. A few of the government's repeated misstatements, nonetheless, must be highlighted here.

On or about April 28-29, 2016, Keith Green was shot and killed. On May 20, 2016, Mr. Traore was arrested for murder. The following day, two other defendants, Tiffany Li and Kaveh Bayat, were

also charged with that murder. After Mr. Traore's arrest, he gave 17 hours of statements to law enforcement, in which, after initial untruths, he ultimately gave a full accounting of his knowledge of the killing. Law enforcement fully investigated Mr. Traore's reports of what happened and found significant forensic evidence (including cell phone data, DNA and video evidence) corroborating Mr. Traore's account of what happened. Accordingly, the information from Mr. Traore was used at the preliminary hearing to hold Ms. Li and Mr. Bayat for murder.

In sum, the People's investigation revealed the following. Ms. Li is the mother of Mr. Green's two children, and Mr. Bayat was Ms. Li's boyfriend at the time of the murder. Mr. Traore was a friend of Ms. Li and Mr. Bayat. Ms. Li is extremely wealthy and greatly assisted Mr. Traore and his wife financially, including providing them with an apartment to live in and other financial benefits. Mr. Traore also occasionally worked for Ms. Li and Mr. Bayat as a limousine driver and body guard, and was given many other lucrative employment opportunities. Ms. Li and Mr. Green were in a custody dispute over their children and he was demanding a great deal of financial support. Ms. Li and Mr. Bayat approached Mr. Traore and offered him $50,000 to kill Mr. Green. Mr. Traore rejected the idea outright, but agreed he would help them try to intimidate Mr. Green so he would leave them alone and not make any further demands.

On April 28, 2016, Mr. Bayat asked Mr. Traore to observe a meeting between Mr. Green and Ms. Li at the Millbrae Pancake House to ensure her protection. Mr. Traore observed the meeting and followed Mr. Green and Ms. Li when they left to Ms. Li's home in Hillsborough. Mr. Traore went back to his home (provided to him by Ms. Li) in Burlingame. This was all confirmed by cell phone records and traffic cameras. Later that night, Ms. Li and Mr. Green showed up at Mr. Traore's residence with Mr. Green dead in their car, being propped up in the front passaged seat by Mr. Bayat sitting behind him. Mr. Traore was told to dispose of the body because "we have helped you and now it's time for you to help us," referencing the significant financial support which Ms. Li and Mr. Bayat had given Mr. Traore and his wife. Mr. Traore's account of the presence of the body in Li's vehicle, his observation of blood on the running board of her car, and the manner in which the body was dragged from Ms. Li's vehicle were all confirmed by forensic evidence.

Mr. Traore did not know that Ms. Li and Mr. Bayat were going to kill Mr. Green until they

arrived with Mr. Green's body. He had a rental car in his possession, but used his own car instead; he did not put a tarp down or otherwise make preparations to hide the fact that Mr. Green's body was in his car; he had no gas in his car and had to go to the gas station to fill the tank; he had been stopped weeks prior because of headlight and taillight violations and had not fixed those problems with his car; and other witnesses also provided evidence that supported Mr. Traore's version of events.

Because law enforcement's investigation into the homicide of Mr. Green revealed substantial forensic and circumstantial evidence that verified the information provided by Mr. Traore, the District Attorney's office concluded that Mr. Traore's role in the death of Mr. Green was limited to his liability as an accessory after the fact and choose to use him as a witness.

On February 22, 2018, the court accepted Mr. Traore's cooperation plea agreement in which he pleaded guilty to violating Cal. Penal Code § 32, accessory after the fact. Mr. Traore agreed to cooperate with the prosecution in a truthful, detailed, complete and candid manner in any future proceeding and/or interview detailing his involvement and/or knowledge concerning the murder case and the parties agreed he would be sentenced to three years imprisonment, the statutory maximum.

On October 5, 2018, Mr. Traore was released from custody. He remained on release until September 12, 2019, when he was remanded for a pretrial violation. After the trial of Ms. Li and Mr. Bayat had commenced, the People decided not to call Mr. Traore as a witness at the trial. Ms. Li was acquitted and Mr. Bayat had a hung jury.[5]

On November 21, 2019, after losing the trial, the people moved to vitiate the plea agreement with Mr. Traore. That motion was withdrawn because Mr. Traore had not done anything in violation of the plea agreement. That is, all of the information that Mr. Traore had provided to the People about the murder was truthful, complete and candid, and detailed his involvement and/or knowledge concerning the murder case. No evidence was found by the People to contradict the veracity of Mr. Traore's statements.

The government, however, is not satisfied with what the state investigation revealed, and contrary to the quantum of evidence to the contrary continues to suggest that Mr. Traore was present

[5] The D.A.'s office subsequently decided not to re-try Mr. Bayat.

*US v. Traore,* Case No. 20-029 VC;
Def.'s Sentencing Memo.                    8

for/a principal in the murder of Mr. Green. That is completely false. Mr. Traore pleaded guilty to the offense to which he was guilty: accessory *after the fact* to murder. After a full investigation, including a review of all forensic and witness evidence, the prosecution concluded that Mr. Traore's involvement was limited to disposing of the body. Accessory, under Cal. PC § 32, is defined as "Every person who, *after a felony has been* committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowing that said principal has committed such felony or has been charged with such felony or convicted, is an accessory to such felony." To argue that a phone call where Mr. Traore states that people might be listening to his call is evidence that he was present at the time of the murder is wholly without merit and shows the lengths the government is willing to go to dirty Mr. Traore. Indeed, they have not even provided the defense with a recording of that supposed call.

On January 10, 2020, Mr. Traore was sentenced to three years in custody as provided under the plea agreement. He was scheduled to be released from jail that same day, having served more than three years already. Mr. Traore served 988 actual days (approximately 33 months), which is the equivalent of a state sentence of 1976 days (approximately 66 months) when good time credits are added, which is significantly longer than the 18 months he was legally required to serve. Linker Decl., Ex. D.

Moreover, almost all of that time is considered "hard time," in that he was in solitary confinement for almost the entirety of it because he was a cooperator and therefore at great risk. Both Dr. Lines and Ms. Bredenstein discuss what a dramatic toll being in solitary confinement for nearly three years took on Mr. Traore's mental and physical health. Instead of being released on January 10, 2020, Mr. Traore was picked up by federal agents based on the instant federal charge, which had been filed that very day.[6]

This is all to say, Mr. Traore has served his time (and then some) for the prior offense he

---

[6] The federal government could have filed such charges as early as 2016 when this issue related to Mr. Traore's identity was made very public. *See e.g.,* https://abc7news.com/keith-green-tiffany-li-millbrae-man-murder-girlfriend-arrested-killed/1365429/. It did not. It waited until literally the day he was scheduled to be released to file a federal complaint. This not only prevented Mr. Traore from even seeking a concurrent sentence for his offenses, *see United States v. Sanchez-Rodriguez*, 161 F.3d 556 (9th Cir. 1998) (lost opportunity to serve concurrent time is a basis for a departure under the guidelines), but also at least suggests that the decision to prosecute Mr. Traore for this offense was linked to the failure to secure a conviction for either Ms. Li or Mr. Bayat, which was not in Mr. Traore's control.

*US v. Traore,* Case No. 20-029 VC;
Def.'s Sentencing Memo.                                        9

committed, accessory after the fact, and the Court should not sentence him more harshly here to make up for something that supposedly was not vindicated there.

This Court is sentencing Mr. Traore for his federal offense of providing a false information on a passport application. When a court looks at criminal history it is usually done with a few things in mind. First, whether the defendant "learned his lesson" from the prior conviction. In other words, whether the defendant, after being convicted and sentenced for a past misdeed, changed his behavior as a result. That is not relevant here because, as explained above, Mr. Traore's instant federal offense predated the San Mateo conviction. Second, criminal history is looked at as an indication of risk of reoffending. These two offenses, however, are such anomalies. They each arose out of unique, specific, and *never again to be replicated* circumstances. Mr. Traore is at a very low risk of reoffending and additional time in custody will do nothing to reduce that risk.

### C.  Overstatement of Criminal History Category

Mr. Traore technically falls into Criminal History Category V, with 10 criminal history points. A careful review of Mr. Traore's criminal history reveals that a Category V substantially over-represents the seriousness of his criminal history or the likelihood that he will commit other crimes thereby warranting either a departure under U.S.S.G. § 4A1.3(b) or a variance under section 3553(a).

Mr. Traore technically falls just one point into Criminal History Category V because of the following. First, unlike most federal statutes, which have a five-year statute of limitations under 18 U.S.C. § 3282, a violation of section 1542 has a ten-year statute of limitation under 18 U.S.C. § 3291. The government charged Mr. Traore in 2020 with conduct from nine years prior (2011), just under the wire for the extended ten-year statute of limitations. As a result, this Court calculates prior convictions dating back to nearly twenty years ago in calculating Mr. Traore's criminal history category because the triggering date for such a calculation is the date of the offense, not the date of charging, conviction or sentencing. Of Mr. Traore's 10 criminal history points, seven are from conduct *over 15 years ago*. If the Court only considered criminal history using the date the federal charges were filed, Mr. Traore would fall into Criminal History Category II and his range would be 8-14 months in Zone B of the guidelines table.

Second, of those seven points from over 15 years ago, four of the points are for one term in

custody of 30 days. Specifically, paragraphs 32 and 34 of the report are for misdemeanor offenses for which the sentence imposed was 60 days. Sixty days is, of course, the bare minimum to provide two, rather than one, criminal history point. So if the sentence had been 59 days, it would have been only one point for each. Additionally, Mr. Traore did half time on those convictions, so only served 30 days total. Moreover, those terms were run concurrently, so it was only one 30-day sentence actually served, yet results in four points.

Third, six of his ten points are for relatively minor misdemeanor offenses.

Fourth, the most serious of his offenses, the felony accessory after the fact conviction from San Mateo County post-dated the offense conduct here. Thus while it is considered criminal "history," it was not a situation where he was sentenced, released, and then committed the instant offense conduct.

Finally, the government may try to argue that Criminal History Category V is appropriate because of Mr. Traore's San Mateo conviction. As argued above, while Mr. Traore's prior conviction is *a* consideration for the Court, he has already been sufficiently punished for that conduct and it is not for this Court to add to the punishment for that crime even if the Court believes that the sentence he received there was inadequate. The parties have each given the Court summaries of the prior, but it was the state court, as well as the San Mateo District Attorney's office, which reviewed all of the evidence and circumstances and determined that the three-year sentence was appropriate. Had the District Attorney's office determined that Mr. Traore was not truthful in that prior case and that the evidence showed he was more involved than he said, it could have withdrawn from the plea agreement and prosecuted Mr. Traore for other crimes, including murder, witness tampering or any of the other allegations the federal government now tries to mount against him. The D.A.'s office did file such a motion, but then withdrew it because there was no legal or factual support for it. Mr. Traore is not dangerous. He certainly committed a felony in helping to dispose of the body of Mr. Green, but he did not kill Mr. Green. He has been punished for what he did, and although the government may be frustrated by the overall outcome of the case in that the principals were not convicted, that does not leave Mr. Traore as the fall guy.

In sum, whether the Court considers it a departure or a variance, Criminal History Category V significantly over-represents the seriousness of Mr. Traore's criminal history and a below guideline

sentence is appropriate.

### D. Treatment Will Be the Strongest Form of Deterrence and Will Best Assist Mr. Traore in Rehabilitation

Revealing his past has not come without consequences. Mr. Traore's anxiety, sleep problems and depression have increased dramatically, making him in dire need of therapy and companionship. One of the Court's important requirements under § 3553(a)(2) is to provide a defendant with needed treatment in the most effective manner. Here, Mr. Traore has not and cannot receive the therapy he needs while in custody. He has been offered no therapy at all in custody, which is because none is available. While jails and prisons often have drug rehabilitation programs, there is no individual therapy. Indeed, those with severe mental health issues are often left with no options. Medications are sometimes prescribed, often without sufficient oversight, and certainly without the parallel therapy that is necessary for effective treatment. For someone like Mr. Traore who has just revealed years of severe abuse, neglect and trauma, intensive talk therapy is critical at this juncture. The only way he can get that needed treatment is out of custody.

Moreover, in consideration of deterrence, it must first be noted that Mr. Traore is at low risk of reoffending. As to reoffending with a similar offense of providing false information on a passport application, it is hard to even imagine how that could happen, so seems unworthy of mention. What other risk of recidivism could the government be concerned about? Being asked by someone else to dump a body? Again, that seems entirely fanciful given the incredible unique and specific circumstances that led to that offense in the first place and the extreme consequences that resulted. In fact, there is no real risk of re-offending here, and the most effective way to ensure that is through a term of supervised release, including treatment, not additional time in custody.

### E. Need to Avoid Unwarranted Disparities in Sentencing

In determining the appropriate sentence, this Court must also avoid unwarranted disparities in sentencing. 18 U.S.C. § 3553(a)(6).

A rough review of prosecutions in the last five years under section 1542 reveals that the most common sentence was a sentence of probation. Linker Decl., ¶ 6. The highest sentence (not counting those where there was also a conviction for aggravated identity theft in violation of 18 U.S.C. § 1028A,

which contains a two-year mandatory consecutive sentence) was a sentence of twelve months and one day run concurrent to a state sentence. *Id*. In that case, the defendant was a U.S. citizen with a significant criminal history (Criminal History Category IV), including a firearm conviction, who obtained a false passport in attempt to flee from pending charges. *Id*. Mr. Traore's situation is much more similar to those of the other defendants who received probationary sentences (sometimes including a term of home confinement) for providing false information to obtain a passport to simply live and work in this country.

### F.  Consideration of the Mr. Traore's Possible Removal from the U.S.

The worst and most severe consequence of Mr. Traore's conviction is not even in the control of this Court: whether he will be removed from the country. While the Court and the parties have had an extensive colloquy on this issue, there still is no certainty as to the outcome. One thing is clear, he is at risk of being deported.

As noted above, Mr. Traore provided immigration with his different aliases and several of his convictions when he applied for his citizenship. He gave a false name, and what appears to be, but he cannot confirm, a false place and date of birth. It is unclear whether he will be eligible for what is called a "fraud waiver," or some other form of relief from removal. Moreover, as he does not know the place where he was born and is not a citizen of any other country, it is difficult to determine to where he would even be deported.

Mr. Traore wants nothing more than to remain in this country to be with his wife and raise his children. Because he does, however, have at least a potential path to remaining in this country *lawfully*, he has ever incentive to abide by all conditions of supervised release and live a law abiding life.

### G.  Home Confinement and Three Years of Probation is Sufficient Punishment

In *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court made abundantly clear that while a term of probation is less severe than a term of incarceration, it is nonetheless a significant punishment as it substantially restricts an individual's liberty.

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U.S. 868,

874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3.

*Id.* at 595 -596 (internal footnotes omitted).

Undoubtedly, those abiding by "shelter-in-place" for the last six weeks have seen what a toll on our liberty it can be to have to stay home, and we have been allowed to leave without permission for walks, grocery shopping, and other essential needs.

While the offense in this case is serious, Mr. Traore has already served sufficient time in custody, and three years of supervised release with six months of home confinement is a commensurate level of punishment for his particular offense. Additional time in custody will add only punishment, and nothing more. It will not contribute to public safety and could be counterproductive. *See* https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/. "Increasingly punitive sentences add little to the deterrent effect of the criminal justice system." *Id*. Studies now show that "deterrence is primarily a function of the *certainty* of punishment, not its *severity*." *Id*. (Emphasis in original).

## II.    A TIME-SERVED SENTENCE IS ALSO WARRANTED IN LIGHT OF THE COVID-19 PANDEMIC

In addition to the factors listed above, this Court must also consider the prudence of continuing Mr. Traore in custody on a non-violent offense in light of the current COVID-19 pandemic. Such consideration is warranted under section 3553(a) (e.g., the need to provide *just* punishment; the need to provide needed medical treatment; the kinds of sentences available).

As of April 24, 2020, the new strain of coronavirus which causes COVID-19, has infected over 2.7 million people, leading to at least 186,832 deaths worldwide.[7] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[8] Governor Newsom declared a State of Emergency and all six Bay Area counties have been under a shelter in place order for six weeks. As of

---

[7] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 24, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

[8] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

*US v. Traore*, Case No. 20-029 VC;
Def.'s Sentencing Memo.                          14

April 24, 2020, there are a total of 39,707 positive cases and 1,562 deaths in California.[9] As of April 24, 2020, there are 1,312 positive cases and 21 deaths in the city of San Francisco and 1,350 positive cases and 56 deaths in Alameda County, where the jail is located.[10] The numbers are rising exponentially. With confirmed cases in San Francisco and the entire Bay Area that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

The situation is even worse in the jails. Conditions of confinement create the ideal environment for the transmission of contagious disease.[11] Public health experts around the world, and particularly in California, are urging the release of individuals from custody to assist in reducing the spread of the virus.[12] An opinion piece in the New York Times describes these unique and pressing issues.[13] Inmates cycle in and out of detention facilities from all over the world country, and people who work in the facilities including correctional officers, and care and service providers leave and return daily, without screening. Incarcerated people generally have poorer health than the general population, and even at the best of times, medical care in custody is (at best) limited.[14] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[15] Outbreaks of the flu regularly occur in jails and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[16]

---

[9] *Coronavirus in California: Map and Case Count*, The New York Times (April 24, 2020), *at* https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (updated regularly).
[10] *Id.*
[11] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[12] *CA Public Health Experts Urge Gov. Newsom to Release Elderly and Medically Vulnerable Populations from Prisons*, *at* https://medium.com/@lee.riley/ca-public-health-experts-urge-gov-newsom-to-release-elderly-and-medically-vulnerable-from-prisons-f41ed7cdbc7f
[13] *Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, *at* https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
[14] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[15] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[16] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

At Santa Rita jail there have been thirty-five positive cases of coronavirus (thirty-three inmates and two staff/contractors) as of April 24, 2020.[17] An additional thirteen individuals are labeled "red," meaning they are displaying symptoms consistent with COVID-19, and ten additional pods (with an unknown number of individuals) are quarantined and labeled "yellow," meaning they have had contact with known or suspected COVID-19 or have a high risk travel history. *Id.* Inmates remain in tight quarters even with the counties' recent release of certain inmates. *Id.* Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items). While the jail has provided each inmate with a mask and one additional bar of soap, which inmates have reported is not always happening, it is hardly enough to protect the population. Additionally, the jail has now restricted all visits to the jail. No family, friends or even experts are allowed into the jail. *Id.*

Santa Rita jail lacks even some basic medical care and certainly lacks the resources necessary to engage in screening and testing of inmates, correctional staff, law enforcement officers and other care and service providers who enter the facility.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into Santa Rita jail and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions.

The situation in jails and prisons is dire. The ACLU projects a dramatic increase in projected deaths in jails if we continue to operate jails as usual and fail to reduce the jail population.[18] While Mr. Traore does not have increased risk factors identified by the CDC for age or health, a general reduction in the jail population is necessary to allow for increased social distancing in the jail and to reduce the strain on the jails in the first place. The release of non-violent defendants, such as Mr. Traore, is widely

---

[17] Alameda County Sheriff's Office COVID-19 update, https://www.alamedacountysheriff.org/admin_covid19.php (April 24, 2020).

[18] *COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails*, *at* https://www.aclu.org/sites/default/files/field_document/aclu_covid19-jail-report_2020-8_1.pdf.

*US v. Traore,* Case No. 20-029 VC;
Def.'s Sentencing Memo.                              16

recognized as the quickest and least controversial means of reducing jail populations.[19] Moreover, while those with age and certain health factors are at greater risk of death and severe illness, much is still unknown about this disease. People of all ages and health backgrounds are becoming severely ill and/or dying,[20] and African-Americans are dying at an even higher risk than other populations.[21]

Even without the COVID-19 pandemic, a time-served sentence is appropriate here. With the addition of that issue, it is all the more imperative to release Mr. Traore from custody. His offense, while serious, should not be a death sentence. The Bureau of Prisons has virtually halted transfers from Santa Rita Jail to federal facilities, so Mr. Traore will remain at Santa Rita for an indefinite period of time if the Court sentences him to any longer in custody. The exponential increase of rates of COVID-19 and the lack of adequate medical care at Santa Rita jail make that a very scary proposition. Additionally, and admittedly, of less concern than the extreme health risks, because Santa Rita jail does not offer the programs otherwise available at a federal facility, he will be forced to serve even more—and "harder"— time than he would if we were not in a worldwide pandemic.

The COVID-19 pandemic must be taken into consideration, and as such, a time-served sentence is appropriate.

## **CONCLUSION**

For the foregoing reasons, Mr. Traore respectfully requests that the Court sentence him to time-served and three years of supervised release with a condition that he spend six months on home confinement.

Dated: __4/27/20_____                    Respectfully submitted,

                                              _____
                                              JODI LINKER
                                              Assistant Federal Public Defender

---

[19] *No One Deserves to Die of Covid-19 in Jail*, New York Times, April 24, 2020, *at* https://www.nytimes.com/2020/04/23/opinion/coronavirus-prisons.html.

[20] *Young and Middle-Aged People, Barely Sick with Covid-19, are Dying of Strokes,* Washington Post, April 25, 2020, *at* https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/

[21] The coronavirus is infecting and killing black Americans at an alarmingly high rate, The Washington Post, April 7, 2020, *at* https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true

*US v. Traore,* Case No. 20-029 VC;
Def.'s Sentencing Memo.                    17